Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/03/2023 08:04 AM CST

State of Nebraska, appellee, v.
Marvel D. Ammons, appellant.
___ N.W.2d ___

Filed December 27, 2022.    No. A-21-812.

1. **Effectiveness of Counsel: Appeal and Error.** Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact.
2. **____: ____.** When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error.
3. **____: ____.** With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision.
4. **Postconviction: Evidence.** In an evidentiary hearing on a motion for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in the evidence and questions of fact.
5. **Postconviction: Constitutional Law.** Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable.
6. **Postconviction: Effectiveness of Counsel: Proof: Appeal and Error.** In order to obtain a new direct appeal as postconviction relief, the defendant must show, by a preponderance of the evidence, that the defendant was denied his or her right to appeal due to the negligence or incompetence of counsel, and through no fault of his or her own.
7. **Postconviction: Effectiveness of Counsel: Appeal and Error.** To establish a right to postconviction relief based on a claim of ineffective assistance of counsel, the defendant has the burden, in accordance with *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to show that counsel's performance was deficient;

that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. Next, the defendant must show that counsel's deficient performance prejudiced the defense in his or her case.

8. **Effectiveness of Counsel: Presumptions.** The two prongs of the test for ineffective assistance of counsel may be addressed in either order, and the entire ineffective assistance analysis should be viewed with the strong presumption that counsel's actions were reasonable.

9. **Postconviction: Effectiveness of Counsel: Presumptions: Appeal and Error.** A lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable. In such circumstances where counsel deficiently fails to file or perfect an appeal, prejudice will be presumed and counsel will be deemed ineffective, thus entitling the defendant to postconviction relief.

10. **Effectiveness of Counsel: Appeal and Error.** In those cases where the defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, whether counsel has performed deficiently by not filing a notice of appeal is determined using a reasonableness inquiry that considers whether counsel consulted with the defendant about an appeal.

11. **Effectiveness of Counsel: Appeal and Error: Words and Phrases.** In the context of a claim of ineffectiveness of counsel, the term "consult" means advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes.

12. **Effectiveness of Counsel: Appeal and Error.** If counsel has consulted with the defendant, counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal.

13. ____: ____. If counsel has not consulted with the defendant, the court must in turn ask a second, and subsidiary, question: whether counsel's failure to consult with the defendant with respect to an appeal itself constitutes deficient performance.

14. **Constitutional Law: Attorney and Client: Appeal and Error.** Counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he or she was interested in

appealing. In making this determination, courts must take into account all the information counsel knew or should have known.

15. **Effectiveness of Counsel: Proof: Appeal and Error.** To show prejudice in the context of trial counsel's failure to file a direct appeal, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with the defendant about an appeal, he or she would have timely appealed.

16. \_\_\_\_: \_\_\_\_: \_\_\_\_. In the context of trial counsel's failure to file a direct appeal, the prejudice inquiry may be satisfied if the defendant shows nonfrivolous grounds for appeal.

17. **Postconviction: Evidence.** In an evidentiary hearing on a motion for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in the evidence and questions of fact.

18. **Postconviction: Evidence: Witnesses.** Triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof.

Appeal from the District Court for Douglas County: J Russell Derr, Judge. Reversed and remanded with directions.

Sarah M. Mooney, of Mooney Law Office, for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

Pirtle, Chief Judge, and Bishop and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

Marvel D. Ammons appeals from the order of the Douglas County District Court denying his motion for postconviction relief following an evidentiary hearing. Ammons claims that he received ineffective assistance of trial counsel when counsel failed to file a direct appeal after his guilty plea to two counts of possession of a deadly weapon (firearm) by a prohibited person. We reverse the denial of Ammons' motion for postconviction relief and remand the matter to the district court with directions to grant Ammons a new direct appeal.

## II. BACKGROUND

### 1. Charges, Plea, and Sentencing

On March 5, 2019, the State filed an information charging Ammons with two counts of possession of a deadly weapon (firearm) by a prohibited person, second offense, each a Class IB felony, pursuant to Neb. Rev. Stat. § 28-1206(3)(b) (Supp. 2017). Both counts were alleged to have occurred "[o]n or about" January 10. On March 6, the State filed an amended information charging Ammons with the same two counts, but this time stated that both counts were alleged to have occurred "[o]n or about" September 14, 2017.

On August 14, 2019, the State filed a second amended information charging Ammons with five counts: counts 1 and 2, possession of a deadly weapon (firearm) by a prohibited person, second offense, each a Class IB felony, pursuant to § 28-1206(3)(b); count 3, "Delivery[,] Distribution, or Possession With Intent to Deliver a Schedule I, II, or III Controlled Substance [("Methylenedioxymethamphetamine (MDMA)")]," a Class IIA felony, pursuant to Neb. Rev. Stat. § 28-416 (Cum. Supp. 2020); count 4, "Manufacturing, Distributing, or Possession With Intent to Distribute: Base Cocaine (Crack)," a Class IB felony, pursuant to § 28-416; and count 5, being a habitual criminal, pursuant to Neb. Rev. Stat. § 29-2221 (Reissue 2016). All five counts were alleged to have occurred "[o]n or about" September 14, 2017.

On January 30, 2020, the State filed a third amended information charging Ammons with two counts of possession of a deadly weapon (firearm) by a prohibited person, first offense, each a Class ID felony, pursuant to § 28-1206(3)(b). Both counts were alleged to have occurred "[o]n or about" September 14, 2017.

A hearing was held on January 30, 2020. Pursuant to a plea agreement, Ammons pled guilty to the two counts in the third amended information. After the district court informed Ammons of the possible sentence for each of the offenses and that the court could run the sentences concurrent or

consecutive to one another, Ammons' counsel stated that "as part of the plea agreement, the State is going to have no objection to the sentences running concurrently." The court responded, "Okay. Very good. And I'm not bound by that . . . . I will take that into strong consideration, but, again, I, alone, will be the one who decides the sentence. Do you understand that?" Ammons replied in the affirmative.

According to the factual basis provided by the State,

[T]he facts here occurred September 14, 2017. Omaha police were in the area of . . . Lothrop Street regarding a call for shots fired. In that area, they were in a parking lot for an apartment complex there, and they observed a Jeep Cherokee with two occupants in the front.

They got out of their vehicle to make contact with those individuals, and both those individuals exited the Jeep and ran. The person in the driver's seat was initially described as a black male, 5'10", with a bald head and black-rimmed glasses.

One of the officers followed him to an alley to the north, observed that person fall down, drop a few items, and then keep running. The officer lost sight of him, discontinued that chase.

In the alley they located two firearms and two cell phones. A crime lab collected those items. The cell phone was dusted for prints, did have one latent fingerprint on it, and it came back to the left thumb of . . . Ammons.

Additionally, the Jeep that the individuals had been in was searched. Inside that Jeep was paperwork regarding a rental agreement indicating that . . . Ammons had rented that car three days earlier at Eppley Airfield.

Additionally, Your Honor, there was some DNA testing done in this case of the firearms that were found in the alley. Those two firearms were — there were DNA profiles located on those firearms. They were compared to the known DNA profile of . . . Ammons, and they did come back indicating his DNA profile was consistent with what was located on the firearms.

> There was also DNA run on two beer bottles inside the Jeep, and both of those did come back with information consistent with what . . . Ammons's DNA was as well, Judge. This all did occur in Douglas County, Nebraska.

The State also offered into evidence a certified copy of Ammons' 2010 conviction for possession of a deadly weapon by a felon, a Class III felony, "making . . . Ammons prohibited"; the exhibit was received without objection.

The district court accepted Ammons' guilty pleas to the two counts in the third amended information—possession of a deadly weapon (firearm) by a prohibited person, first offense—and found him guilty of the same. The case was set for a sentencing date of April 14, 2020, and was later continued to May 19.

Ammons failed to appear for sentencing on May 19, 2020, and a bench warrant was issued for his arrest. A sentencing hearing was subsequently held via videoconference on September 15. Trial counsel made arguments on Ammons' behalf to the district court. Trial counsel then said, "[The State] can correct me if I'm wrong, but I believe that when we struck this plea agreement, I don't believe that [the State] had any objection to concurrent sentences in this matter." The State responded:

> Yeah. You know . . . I didn't document that anywhere. You know, obviously, it wasn't part of the agreement. I didn't document it anywhere on the file, so I can't say that — I'm not asking for consecutive, per se. I'll leave it up to the Court. That's all I can say based on my recollection and my documentation . . . .

In its argument to the district court, the State noted that when Ammons failed to appear at the May 2020 sentencing hearing, a bench warrant was issued for his arrest. The State said, "[Ammons], in fact, was arrested on that warrant in the state of California on board an airplane bound from San Francisco to Houston" and at the time was traveling under an alias, and "Douglas County then had to go and retrieve him"; "those

things are aggravating factors." The State was "not suggesting a [sentencing] range"; "the Court is aware of [Ammons'] record and can see what his previous sentences have been, and I'll leave it at that."

Ammons then personally addressed the district court and stated, in part, that he "wasn't running," he was "just scared" because he had seen videos and "people seemed like they were suffering in jail and dying in jail, and I thought I was going to be sent somewhere to die"; he mentioned having to help with two "COVID" related funerals in the weeks prior to the May sentencing hearing, and additionally having two relatives test positive for "COVID."

The district court, after taking into account Ammons' "record and the seriousness of these charges," sentenced Ammons to consecutive terms of 6 to 8 years' imprisonment on each count, with credit for 50 days already served on count 1 only. A written order setting forth the orally pronounced sentences was filed September 16, 2020.

Ammons did not timely file a direct appeal of his convictions or sentences.

## 2. POSTCONVICTION

### (a) Verified Motion for Postconviction Relief

On March 11, 2021, Ammons, pro se, filed a "Verified Motion for Postconviction Relief" alleging that he received ineffective assistance of trial counsel because trial counsel did not file a notice of appeal after Ammons' "clear requests." Ammons claimed he "urged trial counsel to perfect a notice of appeal, because [Ammons] was not satisfied with the fact that he was charged with two weapons found on the same premises, and he believed that there should have only been one count." He argued that had he "known that he could not be charged with two offenses culminating from one incident, he would have elected to go to trial instead of pleading no contest." Ammons was "convinced that, had counsel perfected the notice of appeal, the Appellate Court would have

reversed and remanded the matter back to the District Court and instructed them to require that he be charged, convicted, and sentenced for one count of Possession of a Deadly Weapon by a Prohibited Person." Ammons requested that the district court "reinstate his direct appeal, so that he can adequately adjudicate his constitutional claims in a timely manner."

The district court set the matter for an evidentiary hearing "on the sole issue of whether counsel was ineffective in failing to file a direct appeal." The court appointed counsel to represent Ammons and ordered that all testimony would be done by deposition.

### (b) Evidentiary Hearing

An evidentiary hearing on Ammons' motion for postconviction relief was held on July 28, 2021. The bill of exceptions from both the plea hearing and sentencing hearing were submitted to the district court. The depositions of Ammons, Ammons' wife, and trial counsel were submitted to the court. We summarize the testimony from those depositions.

### (i) Ammons' Deposition Testimony

In his deposition, Ammons testified that after he was arrested in 2019, he hired trial counsel to represent him. During the course of Ammons' criminal case, he met with trial counsel to discuss the case; Ammons' wife came to two of the meetings, and she was disclosed as an alibi witness to trial counsel by Ammons. Ammons denied that he and his wife ever had a falling out during the course of his case. Ammons' case was set for trial, and additional charges were filed against him.

"A week before trial," Ammons met with trial counsel to discuss a plea offer. The following colloquy was had regarding the plea offer.

> Q. [by postconviction counsel] What was the plea offer?
>
> A. [by Ammons] Plead to two counts of prohibited person, 3 to 50.

Q. Was it your understanding that this would be reducing it from a second offense to a first offense?

A. Yes.

Q. On both counts?

A. Yes.

Q. And any other charges would be dismissed?

A. Yes.

Q. When you first met with [trial counsel], were you happy with this plea offer?

A. No.

Q. Were you frustrated?

A. Yes, and upset.

Q. Did you discuss still going to trial and not taking the plea offer with [trial counsel]?

A. Yes.

Q. At the end of the meeting when you left [trial counsel's] office, had you accepted the plea offer?

A. No.

Q. What did you tell [trial counsel]?

A. I will be in contact with him within the next day or two.

Q. Did you need some time to think it over?

A. Yes, and discuss it with my wife.

Q. At some point did you then call [trial counsel] on the phone to discuss the plea offer further?

A. Yes.

Q. And at that point did you accept the plea offer?

A. Yes, with the understanding that I would receive concurrent sentences.

Q. And I guess just to follow up, . . . that there would be request [sic] for concurrent sentences. Is that fair to say?

A. Yes.

Q. That was not part of the plea agreement?

A. No.

Q. Did you and [trial counsel] have discussions about wanting to request concurrent sentences?

A. Yes.

Q. Up until this point, do you recall having any conversations with [trial counsel] about an appeal?

A. Not until I was at court for the plea agreement, I asked him if my plea would affect an appeal.

. . . .

Q. And was it your understanding that you could still appeal parts of your case even if you took a plea?

A. Yes.

Ammons failed to appear at his first sentencing hearing because he "was scared, overwhelmed, upset, worried." He was later arrested on a bench warrant, and the case was set for a new sentencing hearing. Between the time of his arrest on the warrant until sentencing, Ammons met with trial counsel "[o]ne time," "maybe a day or two" before sentencing; no discussions about an appeal or the appeal process were had at the meeting.

Ammons was not sitting next to trial counsel at the sentencing hearing; Ammons was at the jail when the sentencing hearing was conducted. Ammons stated that the sentencing hearing took place "over a monitor" and that "[a]s soon as I was sentenced, the monitors cut off and that was it." Ammons said that at the sentencing hearing, "[t]he State said that they wouldn't request consecutive or necessarily be for or against concurrent sentences," and he received two consecutive sentences. After the sentencing hearing, Ammons never saw trial counsel in person and he did not receive a letter from trial counsel outlining his appeal options.

Two days after his September 2020 sentencing, Ammons was transported to a different facility. "Within the first week" of being at that new facility, Ammons spoke with his wife and requested that she contact trial counsel because Ammons "was interested in appealing and to get my paperwork for an appeal." Ammons also asked his "god brother, Darrell Granderson," to contact trial counsel. And Ammons sent trial counsel a letter requesting his "paperwork so I can file an appeal." Eventually,

Ammons decided to file an appeal on his own because he could not get in contact with trial counsel; prior to this case, Ammons had never filed an appeal. At the time, Ammons was not aware that he needed to file an appeal within 30 days of the date of his sentencing. Ammons filed his appeal in "December of 2020," and again in "February of 2021"; he "had to do it twice because the first time I did it incorrectly." Ammons wanted a direct appeal, and he felt like he did everything he could to file a direct appeal. He subsequently filed a motion for postconviction relief.

On cross-examination, Ammons was asked what took him so long to file his own direct appeal. He responded that he "had to do the research and learn how to do it myself." (He had previously confirmed that, due to the COVID-19 pandemic and being placed on a 14-day quarantine, his ability to go to the law library at the correctional facility was restricted.) When asked what issue he wanted to appeal, he responded, "[t]he double-jeopardy excessive sentence." Ammons was asked why he felt like he received excessive sentences. He responded, "[B]oth charges stemmed from one incident. They're not two separate incidents so it should have only been one charge." When asked if he felt the sentences were excessive in light of his record and in light of all of the charges the State would have been able to bring against him if he had gone to trial, Ammons replied, "Yes."

*(ii) Ammons' Wife's Deposition Testimony*

In her deposition, Ammons' wife testified that she has been a booking officer at a county youth center for 16 years. She further testified that she was present at one of the meetings between Ammons and his trial counsel and that she also individually met trial counsel on one other occasion to discuss Ammons' case; during those two meetings, she did not hear any conversations about an appeal. Ammons' wife stated that at some point, she and trial counsel discussed the potential of her being an alibi witness. She said she stayed involved in

the case through the plea and denied that she and Ammons ever had a falling out. During her discussions with Ammons, she learned that Ammons would be pleading to two charges; when asked if there were discussions about concurrent sentences, she said, "Yes." Ammons' wife did not appear at the plea hearing or at the sentencing hearing. At some point after sentencing, Ammons informed his wife about his sentences. It was her understanding that Ammons wanted to appeal his case. She said that "within the week" after Ammons was sentenced, she called trial counsel twice, but was not able to get in contact with trial counsel; both times, she left a message for trial counsel with his receptionist asking "about [Ammons'] paperwork, his motions to discovery, I believe, and an appeal process." She asked that trial counsel call her back, but she never spoke with him. When asked when she last spoke with trial counsel about Ammons' case, she responded, "[i]t was the last time me and him had that consultation about the alibi."

### (iii) Trial Counsel's Deposition Testimony

In his deposition, trial counsel testified that he was privately retained on January 15, 2019, to represent Ammons in the underlying criminal matter. Trial counsel said that he had a "lot of conversations" with Ammons, who had "some serious charges against him" and that "I was doing whatever I could to get them reduced, and eventually we were able to reach a plea agreement that was acceptable to him." Although Ammons' wife had been present at some of the consultations, trial counsel believed that the consultation regarding the plea agreement was with Ammons only; "there was some tension between [Ammons and his wife]" "[b]ecause she was potentially a witness with respect to an alibi and that didn't come to fruition." During trial counsel's discussion with Ammons, his "attitude was sometimes to go to trial, other times, you know, try to get the best deal I can get, and we did get a deal significantly less than what he was charged with," so Ammons accepted the plea.

Trial counsel was asked, "During these conversations discussing the plea agreement, did you discuss that at sentencing you would argue for concurrent sentences?" Trial counsel responded, "Yes." When asked if he recalled ever talking to Ammons about an appeal procedure, trial counsel stated:

It would have been a number of times. Initially on January the 15th of 2019, he executed a written fee agreement and in that fee agreement it specifically says that my representation is strictly for the case that was pending. It does not include any appeal or post-conviction matters. That would have gone [sic] over with him and he signed that agreement.

And then every time — my practice is before a client enters a plea, I advise them of their rights that they waive. I tell them that they waive all of those rights except the right to appeal from any sentence that's imposed.

Trial counsel was asked whether he met with Ammons in preparation for sentencing. Trial counsel responded, "I believe so. After the plea, he went on the lam and did not appear for initial sentencing. I think he was picked up in either Nevada or Texas. And as far as I can remember, I would have met with him again prior to the sentencing." Trial counsel argued for concurrent sentences, but Ammons received consecutive sentences.

After sentencing, trial counsel "would have sent [Ammons] the judgment and sentence," but did not file a notice of appeal. However, trial counsel did not have any more in-person conversations with Ammons and did not recall whether Ammons contacted his office regarding an appeal. Trial counsel said "[i]t's possible" that Ammons could have contacted counsel's office, but "our receptionist takes phone messages and I don't have any recollection of any contact"; "[i]t's possible, but I don't believe so." Trial counsel did receive a request from Ammons for copies of the discovery, but counsel did not remember any correspondence with a request for an appeal. Trial counsel was asked if he recalled receiving any phone

calls from Ammons' wife or Darrell Granderson regarding an appeal; trial counsel responded, "No."

On cross-examination, trial counsel stated that he does not have voicemail and that messages left for him are handwritten on a message pad. Trial counsel was asked if in the last 3 years, he noticed that there were a lot of client messages he did not receive. Trial counsel responded, "No." Additionally on cross-examination, trial counsel stated that "if somebody told me that they wanted to appeal, the first thing I'd do would be to file a notice of appeal." If the client could not afford to hire trial counsel for appeal, "then the question would become whether the Court would appoint me on it or appoint somebody else"; but in any situation, trial counsel would move forward with filing that appeal.

### (c) District Court's Order

In an order entered on September 14, 2021, the district court found that Ammons' wife's testimony "shed little light on the issue presented" because she did not recall any conversations in meetings with Ammons and trial counsel where the issue of an appeal was discussed; she "recalls calling [trial counsel's] office twice within a week and a half of [Ammons'] sentencing but she was unable to contact him," and "[s]he states that she left a message with [trial counsel's] receptionist about an appeal."

The district court found that Ammons "also had little to add on this issue." The court said:

> The first time [Ammons] discussed an appeal was "at court for the plea agreement" and that he asked [trial counsel] if this would "affect an appeal" and he was told that he could still appeal. [Ammons] never spoke with [trial counsel] again after the sentencing. [Ammons] recalls speaking with [his wife] after he was sentenced and he recalls asking her to contact [trial counsel] to discuss an appeal. [Ammons] states he filed an appeal with

the Douglas County Court himself in December, 2020 and February, 2021.

The district court said trial counsel "does not recall any personal contact by [Ammons] after his sentencing regarding [Ammons] wanting to appeal," nor does he recall any contact with Ammons' wife or anyone else regarding an appeal for Ammons. Trial counsel "does recall that he received a request from [Ammons] for some of the discovery and he did send [Ammons] copies of the discovery." Trial counsel "stated that if [Ammons] had notified him that he wanted to appeal he would have filed the notice of appeal then he would have determined whether the court would appoint him."

The district court found:

> [Ammons] produced no documentary evidence to support his deposition testimony that he tried to have [trial counsel] file an appeal on his behalf. [Ammons] is not a stranger to the judicial system having previously been convicted of Possession of a Deadly Weapon by a Felon, which by definition, indicates that he had a previous felony conviction to that. [Ammons] was probably motivated to take the plea agreement as the State was going to seek a habitual criminal charge which carries a mandatory sentence by itself of at least 10 years without any "good time." By pleading to the two charges the State dismissed three other charges.
>
> On the other hand, [trial counsel] stated that even though he was not retained by [Ammons] to represent him in an appeal, had [Ammons] asked him to do so he would have timely filed the notice of appeal anyway. The Court finds [trial counsel's] testimony to be credible and [Ammons'] testimony to be less than credible. Weighing [Ammons'] self-interest in making these allegations with the lack of corroborating evidence that he did direct [trial counsel] to file an appeal against the credibility of [trial counsel's] testimony, the Court finds

that [Ammons] did not direct [trial counsel] to file an appeal. Therefore, the Court finds that [trial counsel's] performance was not deficient.

The court overruled Ammons' motion for postconviction relief.

Ammons appeals.

## III. ASSIGNMENT OF ERROR

Ammons claims that the district court erred when it denied his motion for postconviction relief and found that his trial counsel was not ineffective in failing to file a direct appeal.

## IV. STANDARD OF REVIEW

[1-3] Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. *State v. Russell*, 308 Neb. 499, 954 N.W.2d 920 (2021). When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. *Id.* With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision. *State v. Russell, supra*.

[4] In an evidentiary hearing on a motion for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in the evidence and questions of fact. *Id.*

## V. ANALYSIS

### 1. Legal Principles

[5,6] Ammons seeks postconviction relief in the form of a new direct appeal based on allegations of ineffective assistance of trial counsel. Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable. *Id.* In order to obtain a new direct appeal as postconviction

relief, the defendant must show, by a preponderance of the evidence, that the defendant was denied his or her right to appeal due to the negligence or incompetence of counsel, and through no fault of his or her own. *Id.*

[7,8] To establish a right to postconviction relief based on a claim of ineffective assistance of counsel, the defendant has the burden, in accordance with *Strickland v. Washington, supra*, to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Russell, supra*. Next, the defendant must show that counsel's deficient performance prejudiced the defense in his or her case. *Id.* The two prongs of the test for ineffective assistance of counsel may be addressed in either order, and the entire ineffective assistance analysis should be viewed with the strong presumption that counsel's actions were reasonable.

[9-13] On the deficiency prong, the U.S. Supreme Court has said that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable. *State v. Russell, supra*. See, also, *Roe v. Flores-Ortega*, 528 U.S. 470, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000). In such circumstances where counsel deficiently fails to file or perfect an appeal, prejudice will be presumed and counsel will be deemed ineffective, thus entitling the defendant to postconviction relief. See *State v. Russell, supra*. However, a different inquiry is necessary when a determination is made that the defendant did not specifically instruct counsel to file an appeal.

> [T]he U.S. Supreme Court has rejected a bright-line rule that counsel is per se deficient by failing to automatically file a notice of appeal unless the defendant specifically instructs counsel not to. Instead, for cases where the defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, the Court adopted in *Roe v. Flores-Ortega* a reasonableness inquiry for the deficiency prong that considers whether counsel consulted

with the defendant and, if not, whether that failure to consult was deficient performance.

*State v. Russell*, 308 Neb. 499, 507, 954 N.W.2d 920, 927-28 (2021). Regarding an attorney's consultation with a client about filing an appeal, the U.S. Supreme Court has stated:

In those cases where the defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, we believe the question whether counsel has performed deficiently by not filing a notice of appeal is best answered by first asking a separate, but antecedent, question: whether counsel in fact consulted with the defendant about an appeal. We employ the term "consult" to convey a specific meaning—advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes. If counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal. . . . If counsel has not consulted with the defendant, the court must in turn ask a second, and subsidiary, question: whether counsel's failure to consult with the defendant itself constitutes deficient performance. That question lies at the heart of this case: Under what circumstances does counsel have an obligation to consult with the defendant about an appeal?

*Roe v. Flores-Ortega*, 528 U.S. at 478. The U.S. Supreme Court stated that it could not say, "as a *constitutional* matter, that in every case counsel's failure to consult with the defendant about an appeal is necessarily unreasonable, and therefore deficient. Such a holding would be inconsistent with both our decision in *Strickland* and common sense." *Roe v. Flores-Ortega*, 528 U.S. at 479 (emphasis in original). As one example, the Court explained that if a sentencing court's instructions to a defendant about his appeal rights are "so

clear and informative as to substitute for counsel's duty to consult," then counsel might "reasonably decide that he need not repeat that information." *Id*., 528 U.S. at 480.

[14] In rejecting "a bright-line rule that counsel must always consult with the defendant regarding an appeal," the U.S. Supreme Court instead held:

[C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known.

*Roe v. Flores-Ortega*, 528 U.S. 470, 480, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000). The Court pointed out that "a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." *Id*. However, the Court added that even in cases where a defendant pleads guilty,

the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

*Id*.

[15,16] The "second part of the *Strickland* test requires the defendant to show prejudice from counsel's deficient performance." *Roe v. Flores-Ortega*, 528 U.S. at 481. On the prejudice prong of the ineffective assistance analysis seeking

a new direct appeal, the U.S. Supreme Court has said that when counsel's constitutionally deficient performance deprives a defendant of an appeal that the defendant otherwise would have taken, such a denial of a critical stage of the judicial proceedings is one of the extreme failures of performance that demands a presumption of prejudice. *State v. Russell*, 308 Neb. 499, 954 N.W.2d 920 (2021). See, also, *Roe v. Flores-Ortega, supra.* "But the U.S. Supreme Court has explained, with regard to the prejudice prong in an ineffective assistance claim seeking a new direct appeal, that it is a 'critical requirement that counsel's deficient performance must actually cause the forfeiture of the defendant's appeal.'" *State v. Russell*, 308 Neb. at 507-08, 954 N.W.2d at 928 (quoting *Roe v. Flores-Ortega, supra*). To show prejudice in the context of trial counsel's failure to file a direct appeal, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with the defendant about an appeal, he or she would have timely appealed. *State v. Wagner*, 271 Neb. 253, 710 N.W.2d 627 (2006). See, also, *Roe v. Flores-Ortega, supra.* The prejudice inquiry may be satisfied if the defendant shows nonfrivolous grounds for appeal. See *Roe v. Flores-Ortega, supra.*

[17,18] In an evidentiary hearing on a motion for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in the evidence and questions of fact. *State v. Russell, supra.* The role of trier of fact necessarily requires the trial judge to evaluate witness credibility and the weight to be given to witnesses' testimonies. See *id.* Triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Id.* Evidence not directly contradicted is not necessarily binding on the trier of fact. See *id.*

In summary, the legal principles set forth above direct that when a defendant claims trial counsel was ineffective by failing to file a direct appeal following a final judgment in a criminal case, consideration should first be given to whether the

defendant specifically instructed counsel to file an appeal or not to file an appeal, and if no such instruction was given, then whether counsel consulted with the defendant about an appeal. If there was no such consultation, then a court must consider whether counsel's failure to consult with the defendant itself constitutes deficient performance. Additionally, assuming deficient performance is established, consideration must be given to whether counsel's deficient performance prejudiced the defendant. In addressing deficiency, we will first consider whether specific instructions were given by Ammons to file an appeal, and if not, we will consider whether trial counsel engaged in the necessary consultation with Ammons about an appeal. As a final matter, we will address prejudice.

## 2. No Specific Instructions to File Appeal

Although Ammons and his wife testified that they reached out to trial counsel about an appeal, neither was able to personally contact trial counsel. Trial counsel denied receiving any communication from Ammons, Ammons' wife, or Granderson following sentencing, aside from Ammons' letter requesting discovery. Although trial counsel acknowledged receiving a request from Ammons for copies of the discovery after sentencing and acknowledged it was possible that Ammons could have contacted his office, we cannot say that the district court, having weighed the credibility of the witnesses, erred in finding that Ammons did not direct trial counsel to file an appeal. Because trial counsel did not disregard specific instructions to file a notice of appeal, prejudice will not be presumed. See *State v. Russell, supra*. See, also, *State v. Amaya*, 276 Neb. 818, 758 N.W.2d 22 (2008).

## 3. Failure to Consult About Appeal Was Deficient Performance

There is no dispute in this case that trial counsel did not consult with Ammons about an appeal following sentencing. The record also reflects that the district court did not instruct

Ammons about his right to appeal at the time of sentencing. However, when trial counsel was asked during his deposition if he recalled ever talking to Ammons about an appeal procedure, trial counsel responded, "It would have been a number of times." Additionally, Ammons stated in his deposition that when he was "at court for the plea agreement," he asked trial counsel if his plea would affect an appeal, thus indicating his awareness of an appeal process. When Ammons was asked if he understood that he could "still appeal parts of [his] case even if [he] took a plea," he responded, "Yes." Also at the plea hearing, the court asked Ammons, "Do you understand, if you were to have a trial in this case, and if you were convicted of one or both charges, you would have the right to appeal that conviction or convictions to the Nebraska Court of Appeals and/or the Nebraska Supreme Court? Do you understand that?" Ammons responded, "Yes, Your Honor." The court also discussed, and Ammons confirmed his understanding of, Ammons' right to be represented by an attorney at all stages of the criminal proceeding, "including trial and appeal."

Ammons contends that because he asked trial counsel if a plea would impact his ability to appeal, that this conversation should have put trial counsel on notice that Ammons was interested in an appeal. He also points out that "the plan" was to "pursue concurrent sentences," brief for appellant at 10, but that at the sentencing hearing, when trial counsel said the State would not be objecting to concurrent sentences, the State denied that was the agreement. Ammons ultimately received consecutive sentences, which was contrary to "the plan," and consequently, there was reason to think Ammons might want to discuss the advantages and disadvantages of an appeal.

Although the record in this case indicates that trial counsel testified that he spoke with Ammons "a number of times" about an appeal procedure, such conversations would have occurred before Ammons was sentenced to consecutive sentences because trial counsel did not speak with Ammons after sentencing. We are unable to determine whether such presentencing

conversations rose to the level of consulting with Ammons about an appeal, meaning, "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Roe v. Flores-Ortega*, 528 U.S. 470, 478, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000). It is also important to note in this case that the sentencing hearing took place via videoconference. Ammons was not sitting next to trial counsel at the sentencing hearing; Ammons was at the jail when the sentencing hearing was conducted. Ammons stated that the sentencing hearing took place "over a monitor" and that "[a]s soon as I was sentenced, the monitors cut off and that was it." Thus, immediately following sentencing, Ammons had no ability to confer with trial counsel about an appeal—he could neither direct counsel to file an appeal or to consult about the advantages and disadvantages of an appeal—as he would have been able to do if he had been sitting next to counsel at sentencing.

Accordingly, we agree with Ammons that trial counsel's failure to consult with him about an appeal following the imposition of consecutive, rather than concurrent, sentences constituted deficient performance. As set forth previously, "[c]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal . . . or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Roe v. Flores-Ortega*, 528 U.S. at 480. To consult with a defendant about an appeal means "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Roe v. Flores-Ortega*, 528 U.S. at 478. Also, simply giving notice that "'an appeal is available'" or that "'an appeal may be unavailing'" is not sufficient. See *Rojas-Medina v. U.S.*, 924 F.3d 9, 18 (1st Cir. 2019) (at minimum, trial counsel was required to advise client about pros and cons of taking appeal, and then make reasonable effort to ascertain client's wishes; such failure to

consult deprived petitioner of appeal he would have otherwise taken and thus constituted prejudice). See, also, *U.S. v. Herring*, 935 F.3d 1102, 1110 (10th Cir. 2019) (explaining advantages and disadvantages of filing appeal need not impose great burden on counsel; "[h]owever, that conversation, at the very least, must explain what claims—if any—the defendant is entitled to appeal and the strength and weaknesses of those arguments"); *Frazer v. South Carolina*, 430 F.3d 696, 711 (4th Cir. 2005) ("[s]imply demonstrating that the defendant was actually or constructively aware of his right to appeal is insufficient to relieve defense counsel of his obligations under *Flores-Ortega*").

## 4. Deficient Performance Resulted in Prejudice

Having determined there was deficient performance, we now consider whether there was prejudice to Ammons as a result of trial counsel's failure to file a direct appeal. To show prejudice in the context of trial counsel's failure to file a direct appeal, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with the defendant about an appeal, he or she would have timely appealed. *State v. Wagner*, 271 Neb. 253, 710 N.W.2d 627 (2006). See, also, *Roe v. Flores-Ortega, supra*.

In *State v. Russell*, 308 Neb. 499, 507-08, 954 N.W.2d 920, 928 (2021), the Nebraska Supreme Court stated:

> [T]he U.S. Supreme Court has explained, with regard to the prejudice prong in an ineffective assistance claim seeking a new direct appeal, that it is a "critical requirement that counsel's deficient performance must actually cause the forfeiture of the defendant's appeal." Thus, in *Peguero v. United States*, [526 U.S. 23, 119 S. Ct. 961, 143 L. Ed. 2d 18 (1999),] the Court held that the defendant did not sustain his burden to demonstrate he was prejudiced by trial counsel's deficient failure to inform him of his right to appeal, when the defendant had

actual knowledge of the right to appeal and did not request that trial counsel file an appeal. Discussing *Peguero* in *Flores-Ortega*, the Court indicated that in such circumstances, an inquiry into whether counsel was deficient for failing to consult with the defendant as to the right to appeal is unnecessary.

    To the extent [the defendant's] motion attempted to allege that trial counsel's performance was deficient by failing to advise him of the right to appeal, he was not prejudiced by this failure, because he admitted he had actual knowledge from other sources of the right to appeal within 30 days. [The defendant's] postconviction claim correctly focused instead on trial counsel's alleged failure to timely file an appeal despite [the defendant's] alleged request that trial counsel do so.

(Emphasis supplied.)

At oral argument before this court, the State, relying on *State v. Russell, supra*, asserted that if the defendant is aware of his or her right to appeal, then inquiry into trial counsel's deficiency for failure to consult is unnecessary; the only consideration is whether the defendant directed counsel to file an appeal. We have already concluded that trial counsel's failure to consult with Ammons about an appeal constituted deficient conduct under *Roe v. Flores-Ortega, supra*, and the facts presented here; and we do not read *State v. Russell, supra*, to preclude a finding of prejudice in this case simply because Ammons was generally aware he had a right to appeal.

We first note that any reliance by the State on *Peguero v. United States*, 526 U.S. 23, 119 S. Ct. 961, 143 L. Ed. 2d 18 (1999), via *State v. Russell, supra*, is misplaced in the case before us, because *Peguero* was not related to trial counsel's alleged ineffective performance. Rather, the question in *Peguero* was whether the defendant was prejudiced by the trial court's failure to advise him of his right to appeal as required by the Federal Rules of Criminal Procedure. In *Peguero*, the U.S. Supreme Court granted certiorari to resolve

a circuit conflict over whether a district court's failure to advise a defendant of his right to appeal as required by the Federal Rules of Criminal Procedure provides a basis for collateral relief even when the defendant was otherwise aware of his right to appeal. The U.S. Supreme Court held that a district court's failure to advise the defendant of his right to appeal was an error, but that alone did not entitle him to habeas relief if he knew of his right and suffered no prejudice from the omission. The defendant testified at the evidentiary hearing that, upon being sentenced, he at once asked his lawyer to file an appeal. The record indicated that the defendant's trial counsel testified that the defendant told counsel he did not want to appeal, because he hoped to cooperate with the government to earn a sentence reduction as permitted within 1 year of sentencing when a defendant provides substantial assistance in the prosecution of another person. Because the defendant had full knowledge of his right to appeal, the U.S. Supreme Court concluded that the district court's failure to inform him of that right did not prejudice him. Notably, the impact of trial counsel's alleged ineffectiveness because of a failure to consult with a criminal defendant about the advantages and disadvantages of taking an appeal was not discussed in *Peguero* but was addressed the next year in *Roe v. Flores-Ortega*, 528 U.S. 470, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000), as discussed above.

We also observe that in *Roe v. Flores-Ortega, supra*, the U.S. Supreme Court gave a comparison cite to *Peguero* when disapproving a per se prejudice rule. The Court stated a

> *per se* prejudice rule ignores the critical requirement that counsel's deficient performance must actually cause the forfeiture of the defendant's appeal. If the defendant cannot demonstrate that, but for counsel's deficient performance, he would have appealed, counsel's deficient performance has not deprived him of anything, and he is not entitled to relief. Cf. *Peguero v. United States*, 526 U.S. 23[, 119 S. Ct. 961, 143 L. Ed. 2d 18] (1999)

(defendant not prejudiced by court's failure to advise him of his appeal rights, where he had full knowledge of his right to appeal and chose not to do so). Accordingly, we hold that, to show prejudice in these circumstances, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed.

. . . [W]e hold that when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal.

*Roe v. Flores-Ortega*, 528 U.S. at 484 (emphasis in original).

In this case, although the district court noted that Ammons "is not a stranger to the judicial system having previously been convicted of Possession of a Deadly Weapon by a Felon, which by definition, indicates that he had a previous felony conviction," familiarity with the criminal justice system does not necessarily mean familiarity with appellate procedure. Ammons testified that prior to this case, he had never filed an appeal and was not aware that he needed to file an appeal within 30 days of the date of his sentencing. When asked what took him so long to file his own direct appeal, he responded that he "had to do the research and learn how to do it myself." And he had previously confirmed that, due to the COVID-19 pandemic and being placed on a 14-day quarantine, his ability to go to the law library at the correctional facility was restricted. Under the circumstances of this case, Ammons demonstrated that there is a reasonable probability that, but for counsel's failure to consult with him about an appeal, he would have timely appealed; accordingly, he has shown prejudice. See *State v. Wagner*, 271 Neb. 253, 710 N.W.2d 627 (2006).

For the sake of completeness, we also point out that it is not necessary that Ammons demonstrate that his appeal has

merit. "[I]t is unfair to *require* an indigent, perhaps *pro se*, defendant to demonstrate that his hypothetical appeal might have had merit before any advocate has ever reviewed the record in his case in search of potentially meritorious grounds for appeal." *Roe v. Flores-Ortega*, 528 U.S. at 486 (emphasis in original). "Rather, we require the defendant to demonstrate that, but for counsel's deficient conduct, he would have appealed." *Id*. The prejudice inquiry may be satisfied if the defendant shows nonfrivolous grounds for appeal. See *Roe v. Flores-Ortega, supra*.

In the present case, while the likelihood of success on appeal on issues noted by Ammons may not be high, we cannot say that such an appeal would be frivolous. See *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018) (generally within trial court's discretion to direct sentences imposed for separate crimes be served either concurrently or consecutively). See, also, *State v. Hicks*, No. A-20-732, 2021 WL 3354272 (Neb. App. Aug. 3, 2021) (selected for posting to court website) (defendant pled no contest to two counts of possession of deadly weapon by prohibited person, each count relating to one of two pistols defendant received during controlled buy; language of § 28-1206 not ambiguous and simultaneous possession of multiple firearms each consists of separate offense; imposition of two consecutive sentences did not violate Double Jeopardy Clause).

Because Ammons' trial counsel was ineffective, Ammons' motion for postconviction relief should have been granted and he should have been given a new direct appeal.

## VI. CONCLUSION

For the foregoing reasons, we reverse the denial of Ammons' motion for postconviction relief and remand the matter to the district court with directions to grant Ammons a new direct appeal.

REVERSED AND REMANDED WITH DIRECTIONS.